STATE OF MAINE

KENNEBEC, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-96-58
JRA-KEN~ 3/5/2001

DANIEL B. MYSHRALL, JR.,

      Plaintiff

v.

KEYBANK NATIONAL ASSOC.,
f/k/a KEY BANK OF MAINE,

      Defendant

DECISION AND ORDER

## I.    Introduction.

This matter is before the court on the defendant, Key Bank's, motion for summary judgment in which it seeks disposition in its favor on five of six counts of the plaintiff's second amended complaint. The motion has been argued and is in order for disposition.

The plaintiff's grievance, restated in its most abbreviated fashion, is that he obtained a loan from Key Bank to purchase a motorcycle, could not maintain payments on the loan so that his motorcycle was voluntarily repossessed, and that thereafter Key Bank misreported to one or more credit agencies that he had a history of other delinquent loans. He further claims that this erroneous credit history prevented him from obtaining other loans, including business loans, so that he suffered economic losses. He asserts that the defendant's actions in these matters was sufficiently egregious that he is to be awarded punitive damages.

He also makes two other related claims. First, in count V he alleges that he had disability insurance that was to cover his motorcycle payments and that Key

Bank, contrary to their promise to him, did not contact the carrier to have it make the plaintiff's payments while he was disabled. The defendant is not seeking summary judgment on this count. Second, in count VI, the plaintiff claims that the defendant obtained the plaintiff's credit history during this litigation which was for a purpose unauthorized by governing law which therefore warrants an award of damages and attorney's fees.

Last, in count III of the second amended complaint, the plaintiff alleges that the defendant breached a fiduciary duty toward him which is also actionable. In his memorandum in response to the motion for summary judgment, however, the plaintiff concedes that this count may be dismissed because the facts and Maine law applicable in this case do not support such a claim.

II.    Facts.

The facts in this case which are undisputed or, if disputed, are those which the plaintiff claims to be true, are as follows:

On June 2, 1989, the plaintiff, Daniel B. Myshrall, Jr. (Myshrall) signed a retail installment sale contract with Tri-Sports of Topsham from whom he was purchasing a Honda motorcycle. By this contract, $7,065.50 of the total purchase price was financed through Key Bank. This transaction also entailed the purchase of life and disability credit insurance so that if the plaintiff died or became disabled during the contract, the insurance would pay the balance due.

On July 27, 1990, a voluntary repossession of the motorcycle occurred as the plaintiff could no longer make the monthly payments on it. The unpaid balance on

the loan was $6,509.38. After the motorcycle was disposed of, the net loss on the transaction to the defendant was $667.04.

At some point in time, before or during the repossession process, the plaintiff contacted Susan Spaulding at Key Bank to advise her that he was disabled because of an injury and wanted the insurance to go into effect to cover the motorcycle payments. He was told to continue making payments until the insurance company made them. During another conversation, she told him that he need not produce a document from a doctor for the purposes of the insurance.

After the first conversation with Ms. Spaulding, a second occurred that she initiated. In this conversation, Ms. Spaulding asked the plaintiff about his plan for his next loan payment upon which he asked about the status of his insurance. She told him there was no insurance and ultimately told him that she was "some tired of dealing with fucking dead beats" like the plaintiff.[1]

On February 8, 1991, in response to a loan application with the Gardiner Federal Credit Union, CBI (Equifax) issued a consumer credit report which showed two entries with two account numbers from Key Bank, each for a transaction for $7,065, the later entry being described as a collection account. The report appears to treat these entries as separate transactions as they are totaled together with another loan as the total amount borrowed, but does reflect the only amount due on "these" Key Bank transactions as $6,097.00 on the collection account with no balance due on the "other" $7,065 transaction.

---

[1] This is denied by the defendant. *See* answer to second amended complaint, ¶ 4.

3

In early 1992, the plaintiff complained to Key Bank about incorrect reporting on his loans. Daniel Plourde, a credit adjustor in "consumer collections" for Key Bank spoke with the plaintiff, pulled the credit bureau reports, and found that the bank had listed the same account three times. He sent a "remove derogatory letter" to the three credit bureau agencies, TRW, Trans Union and Equifax.[2] He also sent a letter to the plaintiff on February 3, 1992, acknowledging the error, apologizing for the plaintiff's inconvenience, and offering to answer questions and discuss the matter with other creditors. This letter, plaintiff's exhibit 24, was not placed in his file although there was a bank policy that correspondence to a customer would be kept in that customer's file.

After sending the instructions through "clerical" to correct the plaintiff's loan history, Mr. Plourde took no steps to see if his instructions had been followed and neither his practice nor bank policy required him or it to do so, namely to confirm that derogatory credit information had been deleted. Also, a document instructing "clerical" to remove derogatory information would, by practice, have been placed in the customer's loan file by clerical staff, but cannot be located in the plaintiff's file.

On September 7, 1993, attorney Julian Sweet of the firm of Berman & Simmons wrote to Mr. Plourde on behalf of the plaintiff, complaining that his client had been refused credit on three occasions and asking that every credit agency be notified of the correction referenced in Plourde's letter to the plaintiff of February 3,

_____

[2] TRW is also known as Experian, but TRW is used to designate this entity throughout this decision and order. Equifax is also known as CBI, but Equifax is used to designate this entity throughout this decision and order.

4

1992, which, evidently, had been given to Mr. Sweet by the plaintiff, Although the parties debate whether or not Mr. Plourde attempted to contact Mr. Sweet, Mr. Plourde did not check to see if there was still a problem in the plaintiff's credit report and did not accede to Mr. Sweet's request to notify every credit agency of the corrections cited in his letter to the plaintiff of February 3, 1992. He also did not send Mr. Sweet copies of the correspondence correcting the credit errors as the latter had requested. Mr. Plourde did nothing further as to the plaintiff's account thereafter.

After Mr. Sweet's letter to Key Bank, the plaintiff took no action on this matter until his current attorney began asserting a claim in the plaintiff's behalf sometime in 1995 or 1996.

A consumer credit report dated February 17, 1993, from TRW shows its recipient that the plaintiff had three loans with Key Bank, with similar account numbers, terms and dates, but with three different balances showing: $25,200 on one, $600 on the other, and $7,000 on the third; the first two were listed as "repo" accounts, the latter as a paid collection account. An Equifax report of the same date shows only one Key Bank loan for $7,065 with no balance due. Subsequent Equifax reports dated January 11, 1994, February 25, 1994, and February 13, 1995, continue to list the same transaction in the same manner. Subsequent TRW reports dated January 11, 1994, February 13, 1995, October 16, 1995, and November 8, 1996, continue to show the $25,200 and $600 loan balances due, but delete the $7,000 loan. A TRW report of February 25, 1994, however, shows the plaintiff with no loan history with Key Bank. A Key Bank report of November 1, 1999, to TRW shows a loan dated

5

December 12, 1998, which apparently is unrelated to this case. A third credit bureau, Trans Union, shows only one loan transaction with Key Bank, listed as a repossession with an original balance of $667.00, reduced to 0.

The plaintiff was denied credit on a loan application he made to Gardiner Federal Credit Union (GFCU) on February 17, 1993, because an Equifax report showed late payments on a $7,065 loan with Key Bank and TRW reported the three loans of $25,200, $600 and $7,000 that were not satisfactorily handled because they indicated repossession or a paid collection account. GFCU also received reports from TRW as to the plaintiff's credit history on February 13, 1995, and October 16, 1995. The defendant did as well on October 4, 1995. The two reports from TRW to GFCU continued to show the erroneous entry of a $25,200 loan to the plaintiff with a notation of "repo colla." GFCU refused the plaintiff credit on October 16, 1995, based, in part, on the TRW report of that date.

In order for a credit reporting agency to receive loan information, a lending institution such as Key Bank transmits the loan information on a magnetic tape which is generated by Key Bank's computer system. Other lending agencies subscribe to this information to assist them in loan making decisions. All the tapes sent to the credit reporting bureaus by Key Bank are identical. TRW asserts that Key Bank provided the loan information showing the two loans for $25,200 and $600.[3]

---

3 Key Bank disputes this, claiming that because the other two credit reporting agencies correctly reported the plaintiff's loans with Key Bank and because the tapes sent to all these agencies are the same, the error in the credit reports must have occurred at TRW. Defendant's statement of material facts (SMF) ¶ 35.

In order for there to be an entry on the computer tape sent to credit agencies, it would have to be manually entered. Such information would come from Key Bank's computer system. A collector in the collection department can review the file of a customer on the bank's computer system. Susan Spaulding was a collector, but she could not directly make changes in the bank's records that went on the tape. She could, however, generate a document to go to Key Bank's consumer loan department to change information as to a customer. Such a change would also require "correct authority approvals." Plourde Dep. at p. 55. There would have to be some human intervention for the proper amount of a loan obligation to be changed. Susan Spaulding was superior to Daniel Plourde at Key Bank. He also had authority to make a correction by sending it to the bank's clerical area which would then send it to the credit agencies.[4]

In December of 1997, counsel for the defendant asked his client to obtain the plaintiff's credit reports to determine if any consumer reporting agency was misreporting his credit history with Key Bank. Key Bank did so and reported that there was no adverse information as to the plaintiff's credit that was attributable to the defendant. This inquiry by defendant's counsel was in response to plaintiff

---

[4] The defendant via the affidavit of Jean Morisette details the difficulty, if not the impossibility, of a person creating a collection account in a consumer's file that is not accompanied by a real loan. As such, the defendant disputes the inference the plaintiff may wish a factfinder to draw, namely that Ms. Spaulding, perhaps with the assistance of Mr. Plourde, maliciously established at least one fictitious loan, the $25,200 transaction, in the plaintiff's records at Key Bank which was then communicated to at least one credit agency, TRW, in order to harm the plaintiff. They also dispute that this could happen at only one credit agency if the false loan report was generated by them. *See* footnote 3, *supra*.

counsel's complaint that Key Bank was continuing to "misreport" the plaintiff's credit history.

## II. Discussion.

### A. Counts I, II, and IV.

The defendant contends, and the plaintiff cites no authority to the contrary, that federal law preempts state law when a consumer claims he has been wronged by the mishandling of his credit information. Such is not the case, although for purposes of disposition of this motion, state law cannot assist the plaintiff. *See, Equifax Services v. Cohen*, 420 A.2d 189, 211 (Me. 1980).

Title 10 M.R.S.A. § 1311, the Fair Credit Reporting Act (the Act),[5] contains our state law as to potential remedies which consumers may have against others for the misreporting of their credit information. In the Act, our Legislature has provided for civil liability of consumer reporting agencies and users of consumer reports upon their willful or negligent compliance with the Act. 10 M.R.S.A. §§ 1322, 1323. A furnisher of information to a consumer reporting agency, such as Key Bank in this case, had no potential liability imposed on it for misreporting of consumer credit information until the Legislature extended the Act to such entities in 1997, well after this case arose. 10 M.R.S.A. § 1320-A, P.L. 1997, c.155, § B-13. That provision also limited liability of furnishers of information to regulatory action by the Director of the Office of Consumer Credit Regulation. *Id.* Indeed, section 1320-A

---

[5] This statute is miscited by the defendant as 10 U.S.C. § 1311 in its "Index to Statutes" provided in support of its motion. It is, of course, a state rather than a federal statute.

specifically exempts furnishers of consumer credit information from any liability for willful or negligent noncompliance with the Act. 10 M.R.S.A. § 1320(8). All this being so, under the facts in this case, state law cannot assist this plaintiff in his complaint that Key Bank willfully or negligently misinformed consumer reporting agencies about his credit history.

Accordingly, the plaintiff can only turn to federal law for assistance as Key Bank enjoys immunity under state law as to a consumer complaining about misreporting credit information. The federal statute is also called the Fair Credit Reporting Act (FCRA) and may be found at 15 U.S.C.A. § 1601, *et seq.* By its provisions, an aggrieved consumer can also sue in state court. 15 U.S.C.A. § 1681(p). Federal law, however, also provides entities which furnish consumer information qualified immunity. 15 U.S.C.A. § 1681h(e) provides:

> (e) Except as provided in sections 1681n and 1681o of this title, no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, except as to false information furnished with malice or willful intent to injure such consumer.

Because sections 1681n and 1681o, as they existed at the time the plaintiff's cause of action may have arisen, imposed liability on consumer reporting agencies or users of information but did not apply to furnishers of information, federal law, too, excepted the latter entities from liability for willful or negligent noncompliance

9

with this federal statute.[6]  Title 15 U.S.C.A. § 1681h(e), however, excepts from this limited immunity, "false information furnished with malice or willful intent to injure such consumer."  Thus, in order for the plaintiff to proceed against a furnisher of credit information to a consumer reporting agency, it must establish that such a furnisher, here, the defendant, provided false information and did so "with malice or willful intent to injure such consumer."

Although the defendant disputes the plaintiff's contention that the false information about his loans originated from Key Bank, such will be assumed for purposes of the disposition of this motion.  By the same token, although disputed, it will also be assumed that plaintiff has accurately reported Susan Spaulding's intemperate remarks to the plaintiff which suggested she considered him, "a fucking dead beat."  From these facts, as related most favorably to him, the plaintiff asserts that the false entries on the TRW reports were made as the result of Ms. Spaulding's expressed hostility to him and Key Bank's qualified immunity is extinguished.

In response to a motion for a summary judgment, the party with the burden of proof at trial, here the plaintiff, is required to produce evidence that would be sufficient to overcome a motion for a directed verdict; if it fails in this regard, the defendant is entitled to summary judgment.  *H.E.P. Development Group, Inc. v. Nelson*, 606 A.2d 774, 775 (Me. 1992).  Thus, if the evidence produced would result in

---

[6] Congress amended sections 1681n and 1681o, effective September 30, 1997, to impose liability on "any person" for negligent or willful noncompliance with FCRA.  Obviously, this chance in the law has come too late to assist the plaintiff who commenced this action on February 5, 1996.

a jury verdict in the plaintiff's favor which was based on pure conjecture or speculation, a directed verdict or, in this instance, summary judgment is properly entered for the defendant. *Estate of Althenn v. Althenn*, 609 A.2d 711, 714 (Me. 1992).

Applying these principles to the evidence as most favorably recited in support of the plaintiff's case, only conjecture or surmise would permit a rational factfinder to conclude that the incorrect entries on the TRW reports were made "with malice or willful intent to injure [the plaintiff]." 15 U.S.C.A. § 1681h(e).

As noted, the plaintiff relies on Ms. Spaulding's insult and Mr. Plourde's ineffective efforts at correcting his credit history as his evidence of malice or willful intent to injure him via his credit report. Indeed, he must do so because there is no other evidence of malice or willful intent to injure him by any other Key Bank officials. So, while it may be considered proven for purposes of this motion that a Key Bank employee's brief, but offensive, words demonstrate malice, there is no evidence beyond pure speculation that those words became translated into action which resulted in the erroneous credit history appearing on the TRW reports. Indeed, it is unknown when such reports were made or by whom, except that the evidence presented demonstrates that Ms. Spaulding, as a loan collector, could not by herself enter new loans or fictitious derogatory information on a credit history. Thus, the plaintiff seeks to ask a factfinder to make a causative nexus between an affront by a Key Bank employee with the anonymous entry of unfavorable credit information that is connected by no evidence with that offensive conduct. The

11

mere possibility of such a connection is simply too uncertain and is based on conjecture only, so that the plaintiff may not prevail in this cause, even when viewing the evidence favorably to him. *Cyr v. Adamar Assocs. Ltd. Partnership,* 2000 ME 100, ¶ 8, 752 A.2d 603, 604.

Because, in this court's view, the evidence favorable to the plaintiff cannot, beyond pure speculation or conjecture, establish a prima facie case of malice or willful intent to injure the plaintiff via a false credit report, the defendant is entitled to rely on its qualified immunity for the information it furnished to a credit reporting agency. This being so, the pending motion must be granted as to counts I, II and IV.[7]

## B.    Statute of Limitations.

The defendant also seeks judgment in its favor because the applicable statute of limitations expired before this action was commenced. This is an affirmative defense which it must establish as a matter of law based on the material facts not in dispute. M.R. Civ . 56(c); *Northeast Harbor Golf Club v. Harris,* 1999 ME 38, ¶ 15, 725 A.2d 1018, 1023.

As has been discussed, infra, the plaintiff's sole source of a remedy upon an alleged misreporting of his credit history is the federal FCRA. It contains the following provision at 15 U.S.C.A. § 1681p as to a statute of limitations for actions commenced under the FCRA:

---

[7] A claim for punitive damages may not be recovered unless the plaintiff also can be awarded damages on the defendant's tortious conduct. *DiPietro v. Boynton,* 628 A.2d 1019, 1025 (Me. 1993). Because the plaintiff may not recover on his underlying cause of action as expressed in counts I and II, he may therefore not be awarded punitive damages based on this behavior via count IV.

12

An action to enforce any liability created under this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within two years from the date on which the liability arises, except that where a defendant has materially and willfully misrepresented any information required under this subchapter to be disclosed to an individual and the information so misrepresented is material to the establishment of the defendant's liability to that individual under this subchapter, the action may be brought at any time within two years after discovery by the individual of the misrepresentation.

Key Bank's potential liability arose at that point in time where, taking the evidence in the light most favorable to the plaintiff, there was a false report as to his credit history that was furnished with malice or willful intent to injure him. Although it is unknown exactly when Susan Spaulding may have insulted the plaintiff, in all likelihood that event occurred some time near to the repossession of the motorcycle in July of 1990. It is also unknown when Key Bank may have made its first erroneous report to a consumer reporting agency, although the parties' submissions reveal a CBI report having been made to a potential lender on February 8, 1991, which appears to have entered the motorcycle loan twice. The first erroneous entry showing the $25,200 loan appears on a TRW report of February 17, 1993. The exhibits attached to the May 18, 1998 deposition of Wendy Brochu show that GFCU rejected the plaintiff's loan applications because of a report from TRW as late as October 16, 1995.[8]

---

[8] GFCU rejected other loan applicants from the plaintiff on other occasions based on reports from other consumer reporting agencies. The loan rejection of October 16, 1995, was also based on other factors such as poor credit performance with GFCU and the like.

The debate over this issue entails, on the one hand, the defendant's contention that the statute of limitations period began to run either at the time Key Bank may have violated the FCRA or when the violation was discovered by the plaintiff, or, as the defendant argues, the limitations period did not run as long as TRW made erroneous reports as this was a continuous tort. The plaintiff also asserts that the defendant is estopped from relying on this defense.

The court concludes that the defendant is partially correct in its assertions. Applying the federal statute of limitations as cited, infra, most federal courts of appeals have held that a cause of action under the FCRA arises when the offending consumer report is issued, not when it is discovered by the consumer. *Wilson v. Porter*, 921 F.Supp. 758, 759-60 (S.D. F.L. 1995) (citing cases from the Third, Seventh, and Tenth Circuits). Thus, here the first date that a report from a consumer reporting agency was issued which contained all of Key Bank's erroneous reports was on February 13, 1993. Although its discovery by the plaintiff is irrelevant to the consideration of the statute of limitations defense, it is also plain from the record that the plaintiff knew of TRW's and other agencies' misreporting of his credit history before then. In any case, because it is also clear that more than two years had gone by from the first publication of a TRW report which contained Key Bank's errors until the complaint was filed on February 5, 1996, this action is barred by virtue of the federal statute of limitations. 15 U.S.C.A. § 1681p.[9]

---

[9] The exception to the two year period in section 1681p for late discovery by a consumer are inapplicable in this case by the plain meaning of the text of that section.

Even though the federal FCRA is the only basis on which the plaintiff can pursue this action, he nevertheless asks this court to refer to state law in addressing this issue. The Maine statute providing remedies to wronged consumers, 10 M.R.S.A. § 1311, *et seq.*, although inapplicable to this controversy, *see* discussion, infra, has the same two-year statute of limitations as FCRA with language that mirrors the federal provision. As such, it cannot assist the plaintiff.

The statute of limitations as to defamation actions, the cause of action in tort most analogous to this situation, 14 M.R.S.A. § 753, is two years "after the cause of action accrues." *Id*. In a defamation action, the period of limitations begins to run when the offending statement is made. *Tanguay v Asen*, 1998 ME 277, ¶ 7, 722 A.2d 49, 50. This period could be extended if it were interpreted as beginning to run when the victim was injured. *Sturgeon v. Marois Bros., Inc.*, 511 A.2d 1065, 1066 (Me. 1986). Either way, the first "defamatory" report occurred in 1991 and the first injury from a full Key Bank report of erroneous loans occurred in 1993 -- both occasions occurring more than two years before the complaint was filed.

The plaintiff also argues that this was a continuous tort with offense reports and injuries to his credit occurring as late as 1995. This argument also fails for two reasons. First, Maine has not adopted a continuous tort doctrine. Indeed, the case relied on by the plaintiff in this regard, *Dugan v. Martel*, 588 A.2d 744 (Me. 1991), appears to stand for the proposition that a cause of action accrues for purposes of calculating the running of the limitations period "at the point at which a wrongful act produces an injury for which a potential plaintiff is entitled to seek judicial

vindication." *Id.* at 746 (*quoting Williams v. Ford Motor Co.*, 342 A.2d 712, 714 (Me. 1975)). This is the case even when, as in *Dugan*, the plaintiff continues to suffer continuing harms as a result of the defendant's tortious conduct well after it first occurred. Second, this analysis is applicable here because there is no evidence that Key Bank continued to publish, or republish, new reports to TRW or other consumer reporting agencies which contained misinformation about plaintiff's credit history.[10]

The plaintiff also argues that principles of equitable estoppel bar the defendant from relying on the defense of the expiration of the statute of limitations. As noted by the plaintiff, the case of *Northeast Harbor Golf Club, Inc. v. Harris, id.*, ¶ 23, provides an outline for a claim that estoppel may bar reliance upon the passage of the applicable limitations period. Essentially, there must be a showing that the defendant conducted itself in "such a manner which actually induces the plaintiff not to take timely legal action on a claim . . . Only upon a demonstration that the plaintiff had in fact intended to seek legal redresses on [his] claim during the prescripting period can [his] failure to file suit be specifically attributed to the defendant's conduct." *Id.* (*quoting Nuccio v. Nuccio*, 673 A.2d 1331, 1334 (Me. 1996)).

Other than the plaintiff having obtained the assistance of an attorney in 1992 to write to Key Bank asking to no avail that his credit history be corrected, there is no evidence that Key Bank acted in such a way that the plaintiff was actually

---

[10] The plaintiff's statement of material fact, ¶ 13, is to the contrary, but the record references cited do not support the statement that Key Bank was providing false information to TRW in 1995.

16

induced not to sue. Daniel Plourde had corresponded with him in 1992 apologizing for Key Bank's errors and offering to help him. By the time the next year that the plaintiff sought legal help, it is apparent that he knew that Plourde had been ineffective in correcting the errors. Indeed, he knew this in 1993 when GFCU rejected his loan application in part because of a TRW report on his credit history. So, not only is there no evidence that the defendant induced the plaintiff not to sue, the defendant was aware that if there was any such inducement, it was ineffective in solving the credit problems he knew he was having and sought to cure. By the same facts and reasoning, there is no evidence that Daniel Plourde's letter to the plaintiff amounted to a fraudulent concealment of his potential action against Key Bank so that the statute of limitations could be extended to six years. 14 M.R.S.A. § 859. Indeed his letter, plaintiff's exhibit 24, acknowledges Key Bank's erroneous reporting.

For all these reasons, the court must conclude that the plaintiff's action on counts I, II and IV must also fail because the defendant has established via the material facts not in dispute properly before the court that the statute of limitations, state or federal, bars these counts.

C.    1997 Key Bank Inquiry to TRW.

In count VI of the second amended complaint, the plaintiff complains that the defendant on or about December 18, 1997, inquired of a consumer reporting agency as to the plaintiff's credit history without a legitimate business purpose which is a violation of FCRA. In its statement of material facts, the defendant

17

acknowledges that in December of 1997, its counsel requested that it check with the credit reporting agencies as to plaintiff's credit history because plaintiff's counsel represented that Key Bank was continuing to "misreport" the status of his client's loans. The plaintiff cites no facts in opposition to these representations.

In support of this claim, the plaintiff relies on 15 U.S.C.A. §§ 1681n, 1681q, and 1681b(f). Section 1681q is a criminal statute and is inapplicable to this case. Section 1681n does impose civil liability upon any person who willfully fails to comply with any requirement of the applicable subchapter which includes § 1681b(f). The latter section prohibits any person from obtaining ". . . a consumer report for any purpose unless . . . (1) the consumer report is obtained for a purpose . . . authorized . . . under this section." *Id.*

Section 1681b(a)(3) does authorize a consumer reporting agency to furnish a consumer report to "a person which it has reason to believe . . . (A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or . . . (F) otherwise has a legitimate business need for the information -- (i) in connection with a business transaction that is initiated by the consumer; or (ii) to review an account to determine whether the consumer continues to meet the terms of the account."

There appears to be no debate that at the time of this 1997 inquiry, the plaintiff still had an outstanding loan with the defendant. That being so, the defendant was

specifically authorized to review that loan or account.  15 U.S.C. A. § 1681b(a)(3)(A); 1681b(a)(3)(F)(i), (ii).

Moreover, in a case on point, it has been held that a consumer reporting agency had a legitimate reason to provide, and the creditor a legitimate reason to request, the consumer credit report of a party who was suing the creditor for its alleged false reporting of a past due debt.  *Spence v. TRW, Inc.*, 92 F.3d 380, 383 (6th Cir. 1996).[11]  Indeed, a contrary holding would defy logic because if such information were denied to a defendant neither it nor anyone else would have any way of confirming a plaintiff's complaint that his credit history was being marred wrongfully by a reporting creditor.

For all these reasons, the defendant is entitled to summary judgment on count VI as well.

## IV.    CONCLUSION.

The entry will be:

> Defendant's motion for summary judgment is GRANTED; judgment to be ENTERED for the defendant on counts I, II, III, IV and VI of the plaintiff's second amended complaint.  The clerk is directed to set count V for trial.

So ordered.

Dated: March  5  , 2001

John R. Atwood
Justice, Superior Court

---

[11] A case cited by the plaintiff in support of his side of this debate, *Bakker v. McKinnon*, 152 F.3d 1007 (8th Cir. 1998) is inapplicable because the party inquiring about credit history in that case had no legitimate reason to do so.

Date Filed ___2/5/96___ ___Kennebec___ Docket No. ___CV96-58___
County

Action ___Contract___

Vol. Neutral:
Michaela Murphy Esq
One Center St
Waterville Maine 04901

J. ATWOOD

Daniel B. Myshrall,Jr.          vs.     Key Bank of Maine

| Plaintiff's Attorney | Defendant's Attorney James Bowie,Esq. |
|---|---|
| Sumner H. Lipman,Esq. | ~~Wm. J. Kayatta,Jr.,Esq.~~ |
| PO Box 1051 | ~~One Monument Sq~~. PO Box 4630 |
| Augusta, Me.  04332 | Portland, Me.  ~~04101~~ 04112 |
| Walter McKee, Esq. | |

| Date of Entry | |
|---|---|
| 2/5/96 | Complaint filed.  s/Lipman,Esq.<br>ADR scheduling statement mailed to Atty.<br><br>Summons and return of service filed.  Service on Key Bank of Me. on 2/7/96. |
| 2/26/96 | Defendants motion to extend time to respond to complaint filed.<br>s/Kayatta,Jr.,Esq.<br>Proposed order filed. |
| 2/29/96 | ORDER  s/Calkins,J.<br>IT IS HEREBY ORDERED that defendants shall respond to plaintiffs complaint on or before March 18, 1996.<br>Copies mailed to Attys. |
| 3/14/96 | Motion to permit late filing of pretrial scheduling statement filed.<br>s/Lipman,Esq.<br>Request for hearing on motion filed.  s/Lipman,Esq.<br>Proposed order filed. |
| 3/19/96 | Defendants motion to stay this action temporarily and to extend time to respond to complaint filed.  s/Kayatta,Jr.,Esq.<br>Proposed order filed. |
| 3/22/96 | Letter filed.  s/Lipman,Esq. |
| 3/26/96 | ORDER ON MOTION TO EXTEND, Cole, C.J.   (Time extended to April 12, 1996)<br>Copies mailed to attys of record. |
| 4/8/96 | Motion for additional extension to permit later filing of pretrial scheduling statement filed.  s/Lipman,Esq.<br>Request for hearing on motion filed.  s/Lipman,Esq.<br>Proposed order filed. |
| 4/16/96 | Defendant Key Bank of Maines answer filed.  s/Kayatta,Jr.,Esq. |